# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-0622V
### Filed: March 26, 2018
UNPUBLISHED

| | |
|---|---|
| DEBORAH MARINO,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Amy Paula Kokot, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On May 25, 2016, Deborah Marino ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered right shoulder injuries as a result of receiving the influenza ("flu") vaccine on September 25, 2014. Petition at 1-4. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

On April 18, 2017, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for her shoulder injury related to vaccine administration ("SIRVA"). The parties are in agreement that petitioner should be reimbursed $88.88 for out of pocket medical expenses, and there is no lost wages claim. Thus, the only issue remaining before the undersigned is the amount of

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

damages that petitioner shall be awarded in compensation for pain and suffering and emotional distress pursuant to § 15(a)(4).  For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$75,000.00** for pain and suffering and emotional distress.  Thus, the undersigned finds that petitioner is entitled to a total award of **$75,088.88.**

## I.      Procedural History

On October 28, 2016, respondent filed his Rule 4(c) report in which he argued that petitioner was not entitled to compensation in this case.  Respondent's Rule 4(c) Report at 1.  (ECF No. 14).  Respondent asserted that petitioner failed to demonstrate a temporal relationship between the vaccination and the injury.  *Id.* at 5-6.

Because of the disputed facts concerning onset, the undersigned held a fact hearing on March 2, 2017.  At the fact hearing, the undersigned noted that there were two issues to be resolved: (1) the onset of petitioner's symptoms, and (2) whether petitioner sustained a SIRVA injury.  Transcript ("Tr.") at 58.  At the conclusion of the hearing, the undersigned ruled from the bench that petitioner experienced pain "immediately after the flu vaccine was administered and that this was within . . . the specified time frame of 48 hours."  Tr. at 60.  With regard to whether petitioner suffered a SIRVA, the undersigned found that petitioner fulfilled all of the criteria for that injury.  Tr. at 60-61.

On April 18, 2017, the undersigned issued a written ruling on entitlement finding petitioner entitled to compensation for a SIRVA.  Ruling on Entitlement, issued April 18, 2017, at 2-3.  (ECF No. 27).  The parties then began the process of negotiating the proper amount of damages.

On July 26, 2017, petitioner submitted a status report stating that the parties were unable to reach an agreement on damages.  Status Report, filed July 26, 2017 (ECF No. 35).  Petitioner stated that "the parties respectfully request that the Chief Special Master decide damages."  *Id.*  Petitioner submitted her brief on damages on August 28, 2017 (ECF No. 37) and respondent filed his brief on November 13, 2017 (ECF No. 40).  This case is now ripe for a determination concerning petitioner's damages.

## II.     Fact History

### A.  Receipt of Influenza Vaccine and Medical Treatment

Petitioner, a nurse practitioner, received a flu vaccination in her right arm on September 25, 2014 at her place of employment.  Petitioner's Exhibit ("Pet. Ex.") 1 at 1; Pet. Ex. 2 at ¶ 2; Tr. at 6-7.  Petitioner had no history of shoulder problems at the time of vaccination.  Pet. Ex. 6 at 3; Tr. at 59.  Petitioner felt severe pain at the injection site "[i]mmediately following vaccination" and applied ice as soon as she went home after work.  Pet. Ex. 2 at ¶ 3; Tr. at 8, 60.  Petitioner testified that on the date of vaccination, September 25, 2014, she could not lift her arm forward or to the side at all.  Tr. at 23-24.  She testified that she "couldn't move my arm in any way and I knew something was terribly wrong."  Tr. at 24-25.

In the last week of October 2014, petitioner had lunch with a former colleague, Josephine Rigos, LPN.  Pet. Ex. 5 at ¶ 3 (affidavit from Ms. Rigos).  Ms. Rigos was previously responsible for administering flu vaccines to employees at petitioner's place of employment but did not administer the vaccine at issue in this case.  *Id.* at ¶ 1; Tr. at 7.  During lunch, petitioner told Ms. Rigos that she had "been suffering from shoulder pain radiating down her arm since her vaccination."  Pet. Ex. 5 at ¶ 3.  Ms. Rigos stated in her affidavit that petitioner "was visibly uncomfortable and I could see that she [petitioner] was in pain.  I advised her to see her doctor because it was not a normal occurrence."  *Id.*

According to petitioner, she delayed seeking medical treatment for several months because she had "a very busy work schedule and it [was] difficult for me to make appointments."  Pet. Ex. 2 at ¶ 4.  However, she indicated that over time "the pain and stiffness eventually made it difficult for me to do my job properly . . . I had no choice but to seek treatment."  *Id.*  At the fact hearing, she explained that she played tennis in a doubles league and was "waiting for my arm to get better and basing it on the tennis season.  I thought that if I continued playing, I would get well.  But my arm never got better."  Tr. at 12-13.  She stated that after the tennis season ended, she had a one month break and then rejoined the league.  Tr. at 13.  When she rejoined, she "thought that since the pain didn't go away with the tennis, I thought the pain would go away with the rest. And when I came back to play again and still had pain, I realized now I have to do something."  *Id.*

Petitioner testified that she called in February 2015 to schedule an appointment with an orthopedist and that it took about eight weeks to get an appointment.  Tr. at 14, 16-17.  At the time petitioner decided to seek treatment, she continued to have "difficulty moving my right arm. Every night at bedtime, when I was laying down in bed, I had pain throughout the entire evening."  Tr. at 26.

On April 16, 2015, petitioner reported to orthopedist Dr. Kiernan Cody of Bucks County Orthopedic Specialists.  Pet. Ex. 3 at 6-7.  She reported her pain level as 6 out of 10.  Pet. Ex. 3 at 9; Tr. at 28.  She reported that she "continued to work as a nurse practitioner and maintain her active lifestyle, attempting to play tennis which she was persistently bothered by pain in the right shoulder.  She has decreased her activity as a result of the pain."  Pet. Ex. 3 at 6.  Dr. Cody found that petitioner had decreased range of motion, pain, and a positive impingement sign in her right shoulder.  Pet. Ex. 3 at 7.  Dr. Cody diagnosed petitioner with "[r]ight shoulder impingement with adhesive capsulitis."  *Id.*  In his treatment plan, he noted that "she might benefit from her orthopedic modalities to help her improve her range of motion, possibly physical therapy."  *Id.*

An MRI of petitioner's right shoulder was performed on April 21, 2015.  *Id.* at 10-11.  The MRI revealed peripheral supraspinatus and infraspinatus tendinosis.  *Id.* at 11.  Further, the MRI showed mild to moderate peripheral tendinosis of the subscapularis tendon and a tiny anterior peripheral leading edge bursal surface partial tear of the supraspinatus tendon.  *Id.*

Petitioner reported to Jeffrey Kummery, a physician assistant affiliated with Dr. Cody, on April 28, 2015 for a follow up visit.  *Id.* at 4.  She reported her pain level as 5

out of 10.  *Id.* at 5.  PA Kummery noted that the injury "has been interfering with her active lifestyle."  *Id.* at 4.  At this visit she received a cortisone injection in her right shoulder.  *Id.*  PA Kummery discussed a referral to physical therapy, but due to petitioner's busy schedule a home exercise program was instead established.  *Id.* at 4-5.  At the fact hearing, petitioner explained that she knew she would not be able to consistently attend physical therapy sessions due to her "work as a nurse practitioner and because I was busy with my daughter who was, I believe, nine years old at the time, and . . . I couldn't take the time out to take care of myself."  Tr. at 20.

Petitioner testified that the cortisone injection "initially helped, but then within weeks, the pain came right back."  Tr. at 15.  Petitioner testified that she decided not to return to the orthopedist "because I'm a nurse practitioner, I'm not going to take another injection that's not going to permanently help me. And I decided that if I have this pain every day, I will just have to live with it."  Tr. at 21.  Petitioner testified that she did not consider another cortisone shot because she considered it "a temporary solution to a permanent problem."  Tr. at 15.  Petitioner stated that she was still in pain and had to limit the use of her arm to avoid increased pain.  Tr. at 14.  She reported that she could not play football with her daughter and had not played any more tennis.  *Id.*  In addition, at work, she could not lift patients.  *Id.*  She continued to have pain during the night.  *Id.*

Petitioner testified that other than the two orthopedic evaluations and MRI in April 2015, she did not undergo other formal medical evaluations.  Tr. at 21.  Petitioner testified that she performed self-evaluations for her shoulder symptoms.  *Id.*  However, she did not document the self-evaluations.  Tr. at 23-24.  Petitioner testified that she has been a nurse practitioner for 15 years and a registered nurse for a total of 30 years.  Tr. at 22.  She explained that she performed self-evaluations of her range of motion to determine to what degree she could elevate her shoulder to the front and side and at what point the motion was painful.  Tr. at 23.  She also assessed the types of activities she could no longer do, limitations to her activities of daily living, and what activities she now had to do with her left arm rather than her right.  *Id.*

In the medical records, there is some indication that petitioner may have visited her primary care physician for a well exam/physical on May 7, 2015.  *See* Pet. Ex. 4 at 3.  However, the only record related to this visit is a note of the date and diagnosis ("Well Exam/Physical") for the visit on a letter responding to a medical records request.  Pet. Ex. 4 at 3.  The record also contains laboratory results reported on April 24, 2015 that include a notation "PE DB 05/07/15," which could be an indication that the lab work was done in preparation for a May 7, 2015 visit.  Pet. Ex. 4 at 5-7.  However, there are no further records related to a visit on this date.  A letter dated October 30, 2015 from Newtown Medical Group explained that the office's electronic medical record computer server "crashed as of August 27, 2015.  As a result, we are unable to retrieve progress notes for our patients between January 2010 and August 27, 2015."  Pet. Ex. 4 at 4.  However, petitioner testified that other than the two orthopedic evaluations and MRI, she did not undergo any other medical evaluations for her right shoulder problems.  Tr. at 21.  Thus, the undersigned finds that even if further records of a May 7, 2015 office visit existed, it is not likely that they would aid petitioner's position.

### B.  Effect of Injury on Petitioner's Ability to Play Tennis

Petitioner has played tennis since she was 11 years old.  Tr. at 9.  At the time of her vaccination, she had recently begun playing weekly matches in a women's doubles league.  Tr. at 9-10.  She and her partner had won the first three matches.  Tr. at 11; Pet. Ex. D[3] at ¶ 3.  The fourth match was on September 30, 2014, five days after petitioner's vaccination.  Tr. at 11.  Petitioner's tennis partner at the time, Karen Friedman, stated that on September 30, 2014, "Deb [petitioner] arrived to the court for our match complaining that her upper right arm was hurting badly at the spot where she had recently had a vaccine. She was unsure if she would be able to play well let alone play at all."  Pet. Ex. D at ¶ 2; Tr. at 11.  Ms. Friedman stated in her affidavit that she and petitioner discussed strategies to compensate for petitioner's injury and that "Deb had several rough moments and did comment on her pain and discomfort throughout the match."  Pet. Ex. D at ¶ 4.  Petitioner testified that she played her tennis match on September 30, 2014 despite having trouble lifting her arm "because I love tennis, I did not want to sacrifice leaving, nor did I want to disappoint my partner."  Tr. at 25.  Petitioner testified that she and her partner lost the September 30, 2014 match.  Tr. at 12.

At the hearing, Ms. Friedman testified that she did not know petitioner prior to the beginning of the tennis season in September 2014.  Tr. at 41.  Her first impression of petitioner was that "[s]he was a very strong tennis player."  Tr. at 41.  She stated that they had three successful games and "I thought we might be in the running for a winning place."  Tr. at 41.  However, at the fourth match, petitioner was having a problem with her arm and did not play well and was "very uncomfortable."  Tr. at 41-42.

Ms. Friedman stated in her affidavit that their next match was not for two weeks, but that when they met again on October 14, 2014, petitioner's arm was still painful.  Pet. Ex. D at ¶ 5.  Ms. Friedman stated that it appeared to her that "whatever she [petitioner] was feeling was significant because of her level of concern that it was compromising her on so many levels."  *Id.* at ¶ 6.  Petitioner testified that she and her partner did not win any more matches for the rest of the season.  Tr. at 12.  Ms. Friedman stated that petitioner "continued to exhibit pain until January 6, 2015 at which time we decided not to sign up for the next Season's League."  Pet. Ex. D at ¶ 7.  Petitioner testified that she had "severe pain throughout the entire games that we played because I couldn't lift my right arm."  Tr. at 24-25.

The record includes an exhibit labeled "Tennis Schedule of Petitioner."  Pet. Ex. 7.  The schedule was referenced by petitioner during the hearing as her tennis schedule for the fall of 2014.  *See* Tr. at 34-35.  At the top it states "Tennis – Tuesdays 9-11" and below that the following dates are listed: 9/9, 9/16, 9/23, 9/30 (> shot 9/25 hurt), No tennis 10/7, 10/14, 10/21, 10/28, 11/4, 11/11, 11/18, 11/25 off, 12/2, 12/9, 12/16, No tennis 1/6.  Pet. Ex. 7.  Thus, the record reflects that petitioner continued to play tennis on nearly a weekly basis for approximately three months following the vaccination, playing 15 matches during an 18-week season.  *See id.*; Tr. at 19.  Petitioner stated in her affidavit that she "regularly performed [her] rehabilitation exercises" but cannot

---

[3] Nearly all of petitioner's exhibits were filed with exhibit numbers.  However, the exhibits filed on February 16, 2017 were designated as Exhibits A – D.  The undersigned notes that Exhibit A is a duplicate of Exhibit 2 and Exhibit B is a duplicate of Exhibit 5.  Thus, the undersigned cites only the numbered exhibits and Exhibits C and D in this decision.

"safely play tennis again."  Pet. Ex. 2 at ¶ 7.  Petitioner indicated that she was advised by Dr. Cody to "avoid playing tennis until I feel better."  Id. at ¶ 7.  Petitioner testified that she stopped playing tennis after the next season, in approximately May or June of 2015.  Tr. at 12, 34.  She testified that she "never played after that."  Tr. at 34.

At the hearing, petitioner testified that "tennis was my life.  I grew up with tennis.  My parents played tennis.  I feel that I have sacrificed a lot not being able to play tennis because, to me, it was an outlet from a very stressful day and week."  Tr. at 37-38.  She stated, "I miss it terribly and I pretty much don't have any outside activities at this point that I can do.  I was a very active person and now I'm not, and it's frustrating."  Tr. at 38.  Petitioner states that "[n]ot being able to play tennis has caused a major disruption in my life because it provided me a necessary outlet to relieve mental stress while also helping me to remain physically active.  The increased stress and inactivity has affected my life in a negative way."  Pet. Ex. 2 at ¶ 7.

### C.  Effect of Injury on Employment Duties

Petitioner is employed as a nurse practitioner at a facility that includes a wellness center, nursing home, dementia care unit, hospice unit, and assisted living.  Tr. at 6.  Her position requires her to lift patients.  Tr. at 50.  At the hearing, she testified that her injury has affected her at work in that she has "to be very careful not to lift patients with transfers."  Tr. at 14. Petitioner testified that she now must "ask other people to help me lift people in the bed because I wouldn't be able to normally do what I used to do as far as transferring people off commodes, wheelchairs or repositioning people in the bed."  Tr. at 15.  Petitioner testified that "during the day I had pain because of the fact that I was required to do certain things at work that I couldn't avoid."  Tr. at 26.  She explained that she had to write at work because "[w]e didn't have any electronic medical records.  So, I wrote eight hours a day because I was in charge of 150 patients . . . by the end of the day, my shoulder would hurt a lot."  Tr. at 26.  Petitioner testified that she did not miss any days of work between September 25, 2014 and April 16, 2015.  Tr. at 21.

The charge nurse at petitioner's place of employment, Sandi Scaramozzino, stated in her affidavit that prior to September 25, 2014, petitioner was always willing to help her lift patients and never complained of shoulder pain.  Pet. Ex. C at ¶ 8.  However, Ms. Scaramozzino stated that starting in October 2014, petitioner was unable to assist her in lifting patients because of pain in her right shoulder.  Id. at ¶ 9.  Ms. Scaramozzino specifically remembered October 2014 being "an exceptionally busy month, and around Halloween [needing] assistance moving several patients. At this time, Deborah could not help me because of her right shoulder."  Id.  At the hearing, Ms. Scaramozzino testified that petitioner was not able to help with lifting patients around the beginning of November because of petitioner's arm pain.  Tr. at 51.  While there is a minor discrepancy as to the timing of petitioner's inability to assist with moving patients at work between Ms. Scaramozzino's affidavit and testimony, the undersigned finds that this discrepancy is immaterial and does not affect Ms. Scaramozzino's credibility.

Petitioner testified that her injury has affected her work and patients.  Tr. at 38.  She testified, "my whole work ethic was always to do the best job I could and it's very frustrating to want to help people and you can't and you have to go ask other people to help . . . .  It's been a disruption in my work life and my home life . . . it has caused a

stress on me that in everyday life it affects the way I react because I do not have that outlet anymore of being able to play tennis."  Tr. at 38.

### D.  Current Status

At the March 2, 2017 hearing, petitioner demonstrated her range of motion.  She was able to lift her left arm to her ear.  Tr. at 30.  However, when she lifted her right arm laterally, she experienced pain, numbness, and tingling.  Tr. at 30-31.  Petitioner reported that when her arm got "to the very top" the pain level reached 8-9 out of 10. Tr. at 31.  Petitioner then demonstrated raising her arm to the front.  Petitioner reported that her regular pain all day is at 2-3 out of 10, but that when she raised her arm to approximately 75 degrees to the front the pain increased and continued to increase the higher she raised her arm.  Tr. at 32.

### III.    Contentions of the Parties

Petitioner requests reimbursement of $88.88 for past out of pocket medical expenses.  Respondent states that he does not object to that amount.  Petitioner has not claimed lost wages.  Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering and emotional distress.

Respondent proposes a pain and suffering award of $45,000.  Respondent asserts that the medical records do not support petitioner's assertion that her right shoulder pain was immediate,[4] severe, and continues to date.  Respondent's Brief ("Res. Brief") at 5.  Respondent argues that petitioner's medical records and testimony reveal that her right shoulder pain was "relatively mild."  *Id.* Respondent emphasizes that petitioner did not seek medical care until nearly seven months after vaccination and underwent only three evaluations, all within a one-month period.  *Id.*  Respondent states that petitioner's most recent appointment was more than two years ago, and that "petitioner's records are marked by the *absence* of significant pain, disability, and medical treatment."  *Id.* at 6 (emphasis in original).  Respondent notes that petitioner did not undergo surgery or other procedures, did not require prescription medication or physical therapy, did not seek ongoing treatment for impaired range of motion or loss of strength, and had only one cortisone injection.  *Id.*

Respondent highlights that petitioner "was able to participate in weekly tennis matches in the weeks and months following her vaccination . . . thus undermining her contentions that her right shoulder pain was immediate and severe."  *Id.*  Because petitioner's records demonstrate that "her clinical course did not necessitate immediate or ongoing treatment," respondent asserts that an award of $45,000 for pain and suffering is reasonable.  *Id.*

Petitioner cites other SIRVA cases and damages awards and argues that petitioner's shoulder injuries "lasted much longer than the petitioners injuries" in other cases and "are both objectively and subjectively more severe."  Petitioner's Brief ("Pet. Brief") at 4.  Petitioner emphasizes that she suffered shoulder impingement and a bursal surface partial tear of the supraspinatus tendon.  *Id.*  Petitioner argues that in similar cases where the petitioners also did not undergo surgical repair, the petitioner received

---

[4] The undersigned previously found that petitioner experienced immediate pain after the administration of the flu vaccine.  Ruling on Entitlement, issued April 18, 2017, at 2-3.  (ECF No. 27).

damages of at least $75,000. *Id*. Petitioner emphasizes that at the time of the March 2, 2017 fact hearing petitioner reported being in pain and asserts that petitioner's symptoms lasted "two and a half (2 ½) years post-vaccination." *Id*. at 5. Petitioner states that her shoulder symptoms continue to interrupt her professional and personal life and emotional well-being. *Id*. Petitioner states that she is a nurse practitioner and is no longer able to transfer patients without help and assistance, and continues to treat her pain with Motrin, ice, and activity modification. *Id*. Thus, petitioner asserts that an award of $120,000 is warranted. *Id*.

Both parties cite other SPU cases involving a SIRVA after receiving a flu vaccine in support of their claimed amounts. Petitioner cites cases in which petitioners were awarded $75,000 to $91,721.28 in damages. Pet. Brief 3-4. Respondent cites cases in which petitioners were awarded $35,000 and $50,000. Res. Brief at 6-7.

## IV.   Discussion

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125 at *9-11, *citing McAllister v. Sec'y of Health & Human Servs.*, No. 91-103V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving a SIRVA. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute. Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

There are two published decisions involving damages awards for a SIRVA where the damages were not based on informal agreement between the parties. In the first,

*Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017),  the undersigned awarded $85,000.00 for pain and suffering to a petitioner who suffered a SIRVA after receiving the tetanus, diphtheria, acellular pertussis vaccine in March 2015.  *Id.*, at *1.

The petitioner in *Desrosiers* was hampered by the fact that she was six months pregnant at the time of the vaccination.  She was unable to avail herself of treatments which could have improved her condition such as pain medication, steroid injections, and surgery.  Additionally, the petitioner in that case was attempting to work while caring for her one year old child and, after giving birth, her infant.  The *Desrosiers* petitioner suffered a relapse after giving birth.  *Id.*, at *3.  In *Desrosiers*, the petitioner's shoulder injury affected her ability to care for her newborn baby.  *Id.*, at *4.  The petitioner in *Desrosiers* experienced the most severe symptoms for seven months and the duration of her symptoms was at least two and a half years.  *Id.*  The decision in *Desrosiers* expressly stated that the amount of the award was calculated in part to reflect petitioner's particular circumstances and limitations in treatment options imposed by her pregnancy.  *Id.*, at *5.

In the other decision awarding damages not based on agreement between the parties related to a SIRVA, *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 122192 (Fed. Cl. Spec. Mstr. Feb. 1, 2018), the undersigned awarded $85,000 for past pain and suffering and $10,000 for future pain and suffering for the year following the decision.[5]  The petitioner in *Dhanoa* suffered a SIRVA after receiving a flu vaccine in August 2014.  In *Dhanoa*, the petitioner's initial pain level was 5 out of 10, but three months post-vaccination had risen to "nine and one-half or ten and one-half."  *Dhanoa*, 2018 WL 122192, at *3.  In *Dhanoa*, the petitioner sought treatment off and on for a period of over three years.  *Id.*, at *4-5.  Petitioner received two cortisone injections and attended physical therapy sessions off and on over a period of approximately eight months.  *Id.*, at *4-5.  As recently as November 2017, the petitioner in *Dhanoa* required medical treatment, a cortisone injection, for her SIRVA.  *Id.*, at *5.

## A. Severity of Pain and Suffering and Emotional Distress

With respect to the severity of petitioner's injury, at her two orthopedic assessments in April 2015, petitioner reported pain levels of six out of ten and five out of ten.  She had an MRI and received a cortisone injection and a home exercise program, declining a physical therapy referral.  Thus, she did not attend any physical therapy sessions.

The affidavits and hearing testimony establish that petitioner's pain and symptoms have interfered with her ability to play tennis without pain and to perform some of her usual work duties as a nurse practitioner.  Petitioner was able to continue to play tennis nearly on a weekly basis for approximately for three months after her vaccination, with pain and limitations, and did not seek medical care until approximately seven months following her vaccination.  Nevertheless, the evidence shows that petitioner's ability to play tennis, an activity that she previously enjoyed and used for

---

[5] The award for future pain and suffering was reduced to a present value of $9,900.99.

stress reduction and physical activity, has been impacted to the point that she stopped playing altogether.

In addition, the evidence shows that petitioner's ability to perform her usual job duties has been affected.  While she has been able to maintain active employment and did not miss any days of work due to the injury, it has affected her ability to perform at the level at which she was accustomed to performing.  Petitioner's job as a nurse practitioner requires lifting and repositioning of patients and her ability to do so has been negatively impacted.

The undersigned finds that the fact that petitioner did not seek medical care or treatment for her shoulder injury for approximately seven months indicates that her symptoms did not interfere with her ability to perform her job or participate in activities of daily life to a degree that was unmanageable.  As the undersigned stated at the fact hearing, "[t]he fact that Ms. Marino delayed seeking treatment is relevant to the value of her claim, [but] does not defeat her claim."  Tr. at 61.

## B.  Duration of Pain and Suffering and Emotional Distress

The evidence submitted by petitioner shows that petitioner's pain and limitations began on the date of vaccination, September 25, 2014, and continued until at least March 2, 2017, the date of the fact hearing.  The evidence further reflects that petitioner's most intense pain and limiting symptoms lasted for approximately seven months.  Petitioner sought medical care approximately seven months after her vaccination.  At her second and final orthopedic visit, she received a cortisone injection which she testified provided temporary relief from pain and other symptoms.  While she testified that the pain returned after a few weeks, she did not return for further treatment or physical therapy.  Her affidavits and testimony indicate that some level of pain and impairment remained after this time.  The undersigned finds based on a review of the records that petitioner experienced the most intense pain and suffering during the period from September 25, 2014 to April 28, 2015 and that the pain and impairment petitioner experienced after April 28, 2015 was at a reduced level such that petitioner determined it did not require further medical intervention.

## C.  Amount of Award

Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722 at *22-23 (Fed. Cl. Spec. Mstr. Mar, 18, 1996).  Contemporaneous medical records generally provide the most reliable supporting documentation of a medical condition and the effect it has on an individual's daily life.  *See Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections"), *citing United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *see also Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528-29 (Fed. Cir. 1993) (noting that medical records are generally contemporaneous to the medical events recorded and are generally trustworthy records).  In this case, there are few medical records and few

contemporaneous records.  The lack of evidence in this case makes evaluation of petitioner's pain and suffering and emotional distress challenging.

A petitioner who seeks more medical care has not necessarily experienced a greater degree of suffering and distress than a petitioner who seeks less care. Individuals have differing levels of pain tolerance and different thresholds for seeking medical treatment.  However, the undersigned is required to decide this case based on the evidence of record.  A petitioner who has sought more medical care will often have more contemporaneous medical records documenting his or her pain and limitations, which will assist the petitioner in demonstrating his or her level of pain and suffering and emotional distress.  In this case, there is little contemporaneous documentation demonstrating the condition of petitioner's shoulder over time, the level of pain she experienced, and the effect the pain and symptoms had on her daily life.

In this case, the undersigned recognizes that petitioner has suffered a painful injury that has affected her life in many aspects and caused suffering and distress. Petitioner's injury has impacted her ability to move patients and assist colleagues in moving patients in her employment.  Petitioner's injury has resulted in the loss of a longstanding and enjoyable physical activity and outlet for stress relief.

Based on a review of the entire record and consideration of the facts and circumstances as presented here and the other cases cited by the parties, the undersigned awards $75,000 for actual pain and suffering and emotional distress.

## V.     Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $75,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.  In addition, the undersigned finds that petitioner is entitled to compensation for $88.88 in past unreimbursable medical expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $75,088.88 in the form of a check payable to petitioner, Deborah Marino.**  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[6]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.